UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

LEKENDRICK UNDERWOOD                            CIVIL ACTION

v.                                              NO. 19-14038

PARKER TOWING COMPANY, ET AL.                   SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is Parker Towing Company, Inc.'s motion for summary judgment.  For the reasons that follow, the motion is GRANTED.

**Background**

This Jones Act and seaworthiness litigation arises from a deckhand's claim that he injured his back lifting a 57-pound gas-powered water pump, which he had lifted and carried from the vessel to a barge, set down, then lifted again to place it on top of a bucket; a one-man task, all without incident.  He claims the injury occurred when he was removing the pump from on top of the two-foot-tall bucket, after completing the routine task of pumping water from the cargo hold of a barge.

Since 2008, Lekendrick Underwood has worked as a deckhand for Parker Towing Company, Inc., primarily aboard Parker Towing's M/V MISS MORGAN, a 55-foot, twin-engine towboat.

1

Having worked with Parker Towing for 11 years, in October 2019, the M/V MISS MORGAN was assigned to work at the Nucor Steel barge fleet on the Black Warrior River in Tuscaloosa, Alabama, where it would move barges as directed by Parker Towing's customer, Nucor Steel.  In a crew that rotated regularly and consisted of a single deckhand with a single pilot or captain during a day or night shift, there were three captains or pilots on the M/V MISS MORGAN: Larry Ernest, Larry Banks, and Jacob Riley.  Mr. Underwood primarily worked with Captains Ernest and Riley.

Open hopper barges collect rainwater in the open cargo holds. Pumping rainwater out of the hopper barges' open cargo holds at the Nucor Steel fleet was a regular task for the crew of the M/V MISS MORGAN; typically, the captain would assign this task to the deckhand.  To perform this task, the M/V MISS MORGAN kept aboard (on its second or "fleet" deck) four or five portable, gas-powered water pumps, which were either two- or three-inches in size.  The three-inch pumps were slightly bigger at 55-60 pounds and, higher-powered, pumped water faster.  The pumps require the use of hoses, which attach to the pump and are led down to the rainwater, which is then pumped out through the side of the pump.  Larger barges or those with higher coamings required use of an extension hose to reach the water to be pumped out.

As a deckhand aboard a towing vessel, Mr. Underwood performed various tasks including building barge tows, handling lines, shifting barges in and out of a tow, performing barge and vessel maintenance, and operating and repairing the portable water pumps. To perform these tasks, Mr. Underwood regularly lifted, carried, and worked with heavy equipment.  Parker Towing deckhands must be able to carry heavy objects; as part of the functional capacity examination Mr. Underwood underwent before being hired by Parker Towing, Mr. Underwood demonstrated, among other things, the ability to lift and carry 80 pounds for 200 feet.

Before being assigned to a vessel, Parker Towing sent Mr. Underwood to deckhand school, where he learned basic deckhand skills like proper lifting techniques.  Once assigned to a vessel, and throughout his employment, deckhand training continued.  Mr. Underwood initially trained under a senior deckhand and then through on-the-job training, interactive video training courses, and written safety materials.  Mr. Underwood's training included back safety and safe lifting techniques.  This training provided step-by-step instructions for proper lifting to avoid back injuries just like the ones Mr. Underwood allegedly sustained. Parker Towing personnel were instructed, among other things:

- The key principle of safe lifting is that your legs do most of the work.
- To change direction when carrying a loud, you move your feet instead of twisting.

3

- When you start a lift, you squat down to the load with your knees bent and back straight.

Parker Towing does not dictate a maximum lifting standard weight for individuals. However, Parker Towing instructs its employees to use their best judgment and seek assistance when lifting heavy items.[1]  Mr. Underwood knew and understood this policy.

On the night shift of October 30-31, 2019, Mr. Underwood was the deckhand working aboard the M/V MISS MORGAN along with Captain Jacob Riley.  Rainwater had collected in several barges in the Nucor Steel fleet.  When Mr. Underwood came on shift, there were several barges already being pumped out in the Tuscaloosa fleet with the two-inch pumps that were kept on the M/V MISS MORGAN.  At about 1:50 a.m., Nucor Steel requested that the M/V MISS MORGAN pull a hopper barge, the Cooper 108, away from a dock near the Nucor Steel facility and pump out the rainwater that had collected in its cargo hold.  Once the Cooper 108 was clear of the dock, Captain Riley told Mr. Underwood "that the barge needed to be

---

[1] Parker Towing's safety manual offers this guidance:

> Deckhands are frequently required to move equipment that is heavy or awkward. Moving this equipment may require more than one person in order to move or lift the item safely. No deckhand should lift more than he can safely handle. It is the responsibility of the individual deckhand to request assistance from other members of the crew when he feels it is necessary.

4

pumped out."   A routine, one-man task.   Captain Riley gave Mr. Underwood no further directions, orders, or instructions.

According to Mr. Underwood, there were no two-inch pumps available; they were already in use.   Without asking for assistance, Mr. Underwood carried the available three-inch pump from the second deck of the M/V MISS MORGAN down to the vessel's main deck and then to the Cooper 108's deck.   This was a routine task which he had performed in the past without trouble and without incident; he did not believe he needed any help or that it was unsafe to perform alone; and he had no difficulty in lifting, carrying, or setting down the three-inch pump.   Had he thought it was unsafe to do, Mr. Underwood would have told Captain Riley.

The Cooper 108 is a hopper barge with a central cargo hold surrounded by a flat deck at the top of the hold.   Dividing the deck from the hold is the coaming, which is a vertical steel wall that rises a few feet above the surface of the deck.   With the water pump on the deck, Mr. Underwood needed to run an intake hose over the coaming and down into the cargo hold.   Due to the height of the coaming, Mr. Underwood testified that he needed an extension hose to reach the water in the bottom of the barge.   According to Mr. Underwood, the only hose available and compatible with the three-inch pump had a hole in it.   (During the night shift, this damaged hose could not be replaced until the following day shift).

Mr. Underwood did not notify Captain Riley of the problem with the extension hose or the need for a different pump.   Instead, Mr. Underwood performed a workaround, which another captain (Larry Ernest) had previously told him he could do when faced with high coaming and no extension hose.[2]   To give the pump height to allow for the standard hose to reach to the bottom of the barge, Mr. Underwood decided to elevate the pump to extend the hose's reach by placing the pump atop an overturned five-gallon plastic bucket. He had executed this workaround on prior occasions with a two-inch pump.   Mr. Underwood placed the three-inch pump on top of the overturned bucket without issue; the pump began pumping water from the hold of the Cooper 108.   Mr. Underwood returned to the M/V MISS MORGAN while the water pumped.

---

[2] Two other Parker Towing crewmembers testified that they would *not* have suggested placing a pump on top of a plastic bucket. Pilot Larry Barks testified that he would not do so, given his concern that -- if the pump got too hot -- it might melt the plastic bucket.   Captain Riley testified that he "wouldn't have told [Underwood] *not* to do it [place the pump on a bucket]" (emphasis added), but that -- if confronted with Mr. Underwood's situation -- he would have asked the captain to get another pump out of the fleet; to get one of the two-inch pumps with a workable extension hose and put the three-inch pump in place of it.   Both Riley and Barks testified that they would assist their deckhands when asked.   Another deckhand, Dusty Wallace, testified that -- if he discovered an extension hose was not working -- he would:

> [a]sk my captain to come help me. We don't do this all
> the time. I usually get him to help me hang the bar pump
> on the coaming, tie it to the coaming so it don't fall.
> Or we can stop, go get another pump that has the
> extension hose on it and swap it out with the 3-inch --
> or 2-inch, if we needed it.

When the water had been pumped from the Cooper 108, Mr. Underwood returned to the Cooper 108 to shut down the pump and return it, the hose, and the bucket to the M/V MISS MORGAN. After disconnecting the hose and dumping the remaining water out of the pump, Mr. Underwood lifted the pump from the bucket, turned, and set the pump down on the Cooper 108's deck. Mr. Underwood did not employ the safe lifting techniques he learned in deckhand school and on the job training: he did not lift with his legs, did not maintain a straight back, and he stated that he "turned" or twisted his back while lifting. It is undisputed that Mr. Underwood was able to, and did, use safe lifting and moving techniques to place the pump *onto* the bucket in the first place. However, Mr. Underwood submits that the height of the bucket put the pump at an awkward height for safe lifting maneuvers during its removal: he says he was unable to fully bend his knees to take the pump off the bucket and he was required to "crouch over" and bend at the waist; when he "turned," he felt a sharp pain in his lower back. "[W]hen I crouched over to pick it up, that's when I felt the pain in my back when I was turning around [and t]hat's why I put it down on the deck[,]" Mr. Underwood testified. When he set the pump down on the deck, the sharp pain in his back went away. He then picked up the pump and returned it to the second deck of the M/V MISS MORGAN and completed his watch. At shift change, Captain Barks testified that Mr. Underwood told him that he felt a "catch"

7

in his back while handling the pumps, but that it eased up, and he continued to work as he did not think it was a serious injury.

Mr. Underwood did not report the alleged injury before leaving the M/V MISS MORGAN. In fact, at the conclusion of his watch, he signed a written departure report in which he answered "No" to "Have you sustained an injury or illness during the course of this trip?"[3]

When Mr. Underwood left work on Friday, November 1, 2019, he returned home for his scheduled days off. It was then, he says, that his back pain worsened to a point when 48 hours later he had so much pain in his left leg that he could not get out of bed on Sunday morning. When emergency medical technicians arrived, he was told that he was dehydrated and had a charley horse. But the

---

[3] Mr. Underwood now disputes whether he suffered a second injury the day after the pump-moving incident. In the interest of completeness, the Court describes the alleged incident. It is submitted that, the following day, Mr. Underwood was throwing a line while the M/V MISS MORGAN was going through locks when he felt the same pain as the night before. He now suggests the pain was no worse and the incident did nothing to worsen the back injury he now says he suffered due to the pump handling. As with the pump-moving incident, Mr. Underwood performed this task many times in the past, without incident. On occasions when he had or anticipated difficulty, Mr. Underwood knew that he could have requested the vessel captain's assistance. In fact, in the past, Mr. Underwood had requested Captain Riley's assistance when dealing with this line. But on this occasion, Mr. Underwood did not request any assistance. He did not report his alleged injury to Captain Riley and, again, did not report it on his vessel departure report. Mr. Underwood has abandoned this as a separate incident or claim.

pain continued to worsen.  When he went to the hospital the next day, he was given the same diagnosis.  Finally, a week after the alleged injury, he returned to the hospital with ongoing complaints of lower back and leg pain.  He was diagnosed with herniated discs at L4-5 and L5-S1 as well as radiculopathy to the left leg.  It was then that he recalled the pain he felt in his lower back when lifting the three-inch pump.  And it was then that he called Parker Towing to report the injury.

On December 4, 2019, Underwood sued Parker Towing seeking to recover for Parker Towing's alleged negligence under the Jones Act and for the alleged unseaworthiness of the M/V MISS MORGAN under the general maritime law; he also alleges entitlement to maintenance and cure benefits.[4]  Parker Towing now seeks summary relief dismissing the plaintiff's claims.

### I.

Summary judgment is proper if the record discloses no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty

---

[4] When conservative treatment provided no relief, Mr. Underwood underwent a left-sided L5-S1 microdiscectomy earlier this year, which Parker Towing approved and paid for under its cure obligations.

Lobby, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit." Id. at 248.

If the non-movant will bear the burden of proof at trial, the movant "may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." In re La. Crawfish Producers, 852 F.3d 456, 462 (5th Cir. 2017) (citation omitted).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See Anderson, 477 U.S. at 248. Nor do "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation[.]" Brown v. City of Houston, Tex., 337 F.3d 539, 541 (5th Cir. 2003). Ultimately, to avoid summary judgment, the non-movant "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 387 (5th Cir. 2007).

In deciding whether a fact issue exists, the Court views the facts and draws all reasonable inferences in the light most favorable to the non-movant. See Midwest Feeders, Inc. v. Bank of Franklin, 886 F.3d 507, 513 (5th Cir. 2018). And the Court "resolve[s] factual controversies in favor of the nonmoving party," but "only where there is an actual controversy, that is,

when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (citation omitted).

## II.

Mr. Underwood alleges that Parker Towing failed to assure a reasonably safe place to work and that its vessel, the M/V MISS MORGAN, was unseaworthy.   Parker Towing seeks summary relief dismissing both claims.  The Court considers each in turn.

### A.

Under the Jones Act, 46 U.S.C. § 30104, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury, in whole or in part.  Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997)(en banc).  A Jones Act employer has the duty to provide his seaman employees with a reasonably safe place to work.  Colburn v. Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir. 1989).  The duty to provide a reasonably safe workplace is broad in scope, but it is not a form of strict liability; like common law negligence, ordinary prudence under the circumstances is the standard for the duty of care owed by an employer to a seaman.  Gautreaux, 107 F.3d at 335-36.  An employer breaches that duty if it fails to exercise ordinary prudence and is thereby negligent.  Id. at 339.  And if its negligence played a part, however slight, in causing a seaman's injury, then the

11

Jones Act employer owes the seaman damages for its negligence. See id.

For his part, a seaman is held to the standard of the reasonable seaman in like circumstances. Gautreaux, 107 F.3d at 339 (explaining that the circumstances include the employee's reliance on his employer to provide a safe working environment, the seaman's experience, training, or education). And the causation standard is the same for both the employer's negligence and contributory negligence: causation is established if the party's "negligence played any part, even the slightest, in producing the injury". See Martinez v. Offshore Specialty Fabricators, Inc., 481 F. App'x 942, 945, 947 (5th Cir. 2012) (quoting Johnson v. Cenac Towing, Inc., 544 F.3d 296, 303 (5th Cir. 2008)). However, more than mere "but for" causation must be established; the negligence must be a legal cause of the injury. See Johnson, 544 F.3d at 302 (citation omitted).

*B.*

To succeed on his Jones Act claim, Mr. Underwood must prove that Parker Towing's breached its duty to ensure a reasonably safe workplace and that this breach caused his back injury; he must present some evidence from which the fact finder can infer an unsafe work method (here, the alleged unsafe method of single-handedly lifting and maneuvering the three-inch pump to remove it from a bucket) and that Parker Towing knew or should have known of

the danger presented by its work environment or work method. Parker Towing seeks judgment as a matter of law on the ground that it is not liable for plaintiff's alleged back injury because he has failed to present any competent evidence to demonstrate that Parker Towing breached its duty to provide a reasonably safe work environment.  The Court agrees.

Put simply, to prevail in a Jones Act negligence claim:

the plaintiff must present some evidence from which the fact finder can infer that an unsafe condition existed and that the vessel owner either knew, or in the exercise of due care should have known, of the condition.

Martinez v. Offshore Specialty Fabricators, Inc., 481 F. App'x 942, 945, 947 (5th Cir. 2012)(citing Perry v. Morgan Guar. Trust Co. of N.Y., 528 F.2d 1378, 1379 (5th Cir. 1976)).  Significantly, "a Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability." Marvin v. Central Gulf Lines, Inc., 554 F.2d 1295, 1299 (5th Cir.), cert. denied, 434 U.S. 1035 (1978).

Here, it is undisputed that Parker Towing had safe lifting practices and trained its deckhands accordingly; Mr. Underwood was a senior deckhand with 10+ years of experience; as a condition of employment, Mr. Underwood was required to and demonstrated the capacity to lift up to 80 pounds from 36" to 60" occasionally, carry 80 pounds 200 feet, and lift and carry 88 pounds overhead; he was well versed and trained in safe lifting techniques and

alternatives available if presented with equipment or work methods he viewed as unsafe; he had performed the same water pumping task on prior occasions during the course of his decade-long career with Parker Towing; he knew he could ask for Captain Riley's assistance to lift the three-inch pump if he thought it was unsafe as a one-man task; he used safe lifting techniques in lifting and maneuvering the pump leading up to pumping the water; he failed to use safe lifting techniques when removing the pump after pumping the water; if he believed it was unsafe for him to lift the pump, there were alternatives available to him.  Absent from the record is any indication that Parker Towing breached its duty to provide a safe workplace.

In crafting its negligence theory, the plaintiff does not dispute Parker Towing's safe lifting policies and Mr. Underwood's knowledge of and training in these techniques and policies.  Mr. Underwood's expert concedes that the plaintiff's lifting was not impaired or restricted by limited headroom.  The plaintiff submits that Parker Towing failed to articulate a maximum numerical weight limit standard to guide a deckhand's discretion in determining safe lifting capacities.  He also submits that the bucket method was an unsafe workaround and that he was compelled to use it because the extension hose was broken.  Absent from the summary judgment record are facts that support the plaintiff's negligence

theories.   There is simply no evidence creating a triable issue concerning whether the work environment was unreasonably unsafe.

The standard advocated by the plaintiff is one of perfect safety, not ordinary prudence.   There is simply no evidence supporting a finding that it was unsafe or unreasonable for Parker Towing to confer discretion on deckhands in deciding to gauge whether assistance in lifting or performing routine tasks is required.   Under the circumstances of record, the plaintiff offers no evidence to indicate that this policy of discretion was unreasonable, or that it rendered the workplace unsafe.   The plaintiff himself did not believe that the task he undertook in the manner he elected to perform it was unsafe or unreasonable. Indeed, he completed phases of it in lifting the full weight of the three-inch pump, setting it down, and lifting it again, all without incident.   That "additional manpower was there for the asking" is similarly undisputed; there is simply no evidence probative of Parker Towing's negligence, let alone that it was Parker Towing's negligence that caused Mr. Underwood's injury. Cf. Thomas v. Diamond M Drilling Co., 569 F.2d 926, 927-29 (5th Cir. 1978)(affirming the district court's findings, following a bench trial, that the shipowner was not negligent, the rig was seaworthy, and the plaintiff's own negligence was the sole proximate cause of his injury sustained after lifting a 60 to 100-pound pump cap and leaning over it to screw the cap in place; the

15

court determined that removing and replacing mud pump caps was
regarded as a job that could be and was routinely performed by one
man, that the plaintiff had performed the task alone on several
prior occasions, and  that he could have asked for assistance);[5]
cf. also Chisholm v. Sabine Towing & Tansp. Co., Inc., 679 F.2d
60, 62-64 (5th Cir. 1982)(reversing magistrate judge's findings
and conclusions as to causation, determining that the plaintiff
"simply hurt his back carrying ... scrap metal to the deck of the
ship, a duty which plaintiff readily concedes to be no more than

---

[5] There, Thomas argued that the defendant should have required a
second man to assist him or should have required him to use
equipment.  In affirming the district court's rejection of this
argument, the Fifth Circuit observed that "[t]his argument has
been decisive in situations in which shipowners failed to require
seamen to use equipment or assistance necessary to make an
operation minimally safe, leaving the safety precautions to the
option of each seaman."  Id. at 928.  Similar to Thomas, the
plaintiff here argues that Parker Towing should have prohibited
one-man lifts of three-inch pumps (essentially advocating that
Parker Towing breached its duty to provide a safe workplace in
failing to require two men to lift equipment exceeding 50 pounds).
The district court in Thomas found that a mud pump cover can be
safely lifted by one man.  Similarly, the record here supports
Parker Towing's submission that the water pumps could be (and were)
safely lifted by one man using the safe-lifting techniques.  The
plaintiff offers no facts to place this fact in genuine
controversy.  To be sure, the plaintiff himself did not believe he
was undertaking an unsafe task; a task he had performed before and
one in which he performed safely leading up to removing the pump
from the bucket.  By the plaintiff's own admission in his
deposition testimony, it was not until he lifted and "turned" or
twisted that he felt a twinge in his back.  Parker Towing's safe
lifting protocol warned not to turn or twist while lifting, but,
instead, to move your feet.  Even if plaintiff were advocating for
a two-man lift policy, there is likewise no dispute that
"additional manpower was there for the asking."  See id.

a 'normal hazard of his work[,]'" and observing that a condition
of a ship is not grounds for liability if that condition was not
the cause of the plaintiff's injury.).

In support of its motion for summary judgment, Parker Towing
invokes case literature supporting its position that the plaintiff
has failed to submit evidence indicating that one-man lifting
methods for certain weights are *per se* unsafe, particularly where
the plaintiff declines to request assistance.  These and other
heavy-lifting cases constitute persuasive authorities that, where
a plaintiff was trained in safe lifting techniques, is performing
a one-man task, elects to perform a task without assistance that
is available to him, and fails to identify a negligent act on the
part of his employer, there is no Jones Act liability.  See, e.g.,
Henderson v. T&M Boat Rentals, LLC, No. 17-2042, 2018 WL 3819930,
at *6-7 (E.D. La. Aug. 9, 2018)(granting defendants' motion for
summary judgment dismissing the plaintiff's Jones Act and
unseaworthiness claims, finding no evidence of defendants'
negligence; the plaintiff offered no evidence to show that the
indisputably one-man job of lifting a 40- to 50-pound partially
submerged cable constituted an unsafe condition); Schexnayder v.
REC Marine Logistics, LLC, No. 15-2192, 2016 WL 2739354, at *2-3
(E.D. La. May 11, 2016)(Fallon, J.)(granting summary judgment
dismissing the plaintiff's Jones Act and unseaworthiness claims
where the plaintiff was injured lifting a 75-pound grate -- a grate

he had lifted before on his own -- considering that no one instructed him to remove the grate, he had ultimate discretion regarding when and how to perform the noncritical task of maintaining the vessel, and he opted to perform the task when there was no one there to assist him); Gaylor v. Canal Barge Co., Inc., No. 14-2398, 2015 WL 5321756, at *3-4 (E.D. La. Sept. 10, 2015)(granting motion for summary judgment dismissing Jones Act negligence claim where the plaintiff, amply trained in safe lifting techniques, was injured lifting a box he estimated weighed as much as 80 pounds despite his testimony that he thought the company had a 50-pound maximum in place and despite that he routinely stored such heavy boxes and knew there were safe alternatives available);[6] Williams v. Int'l Const. Grp., LLC, No. 10-170, 2011 WL 1116312, at *3-5 (E.D. La. March 23, 2011)(Fallon, J.)(granting summary judgment dismissing Jones Act and unseaworthiness claims in a case in which the plaintiff was injured attempting to lift a heavy pad eye, given that the plaintiff failed to seek the help of others around him, failed to employ available equipment, the plaintiff was trained in safe lifting techniques and stop work authority); Batiste v. Superior Energy Services, LLC, No. 07-9077, 2009 WL 1507357, at *3 (E.D. La. May 28, 2009)(Lemmon, J.)(following bench

---

[6] "Jones Act and unseaworthiness claims related to lifting and carrying accidents," another Section of Court observed, "are frequently barred or limited by the seaman's own fault."  Id. at 3 (citations omitted).

trial, finding no liability under the Jones Act or seaworthiness doctrine where the plaintiff was injured performing his assigned duty of changing a hose on a water pump aboard the vessel; the court found that it was not unsafe for the plaintiff to be requested the pump, which weighed 25- to 50-pounds); Johnson v. Lawson & Lawson Towing Co., Inc., No. 00-629, 2001 WL 812080, at *2 (E.D. La. July 17, 2001)(Vance, J.)(granting defendant's motion for summary judgment, finding no issue of negligence presented; to find otherwise, "the Court would have to accept the proposition that it takes two grown men to safely lift 30 to 35 lbs. to a height of 3 to 4 feet"). Though not binding, these cases simply reinforce the Court's determination that, on this record, the plaintiff has failed to offer up a genuine dispute as to a material fact on workplace safety.

### III.

#### *A.*

Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under the general maritime law. The duty of a vessel owner to provide a seaworthy vessel is an absolute non-delegable duty; the duty imposes liability without fault. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 548-49 (1960). A ship is seaworthy if the vessel, including her equipment and crew, is reasonably fit and safe for the purposes for which it was intended to be used.

Boudreaux v. United States of America, 280 F.3d 461, 468 (5th Cir. 2002) (citation omitted); Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 339 (1955)("The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service."). "[U]nseaworthiness is a condition, and how that condition came into being – whether by negligence or otherwise – is quite irrelevant to the owner's liability for personal injuries resulting from it." Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 498 (1971).

Unseaworthiness is not a fault-based standard; however, a plaintiff must show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992).

> A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper.

Usner, 400 U.S. 494 at 499 (internal citations omitted); see also Webb v. Dresser Indus., 536 F.2d 603, 606 (5th Cir. 1976), cert. denied 429 U.S. 1121 (1977). A vessel is also unseaworthy when an unsafe method of work is used to perform vessel services. Rogers

20

v. Eagle Offshore Drilling Serv., 764 F.2d 300, 303 (5th Cir. 1985); Burns v. Anchor-Wate Co., 469 F.2d 730 (5th Cir. 1972). Still, "[a]n isolated personal negligent act of the crew" is not enough to render a ship unseaworthy. Daughdrill v. Ocean Drilling & Exploration Co., 709 F. Supp. 710, 712 (E.D. La. 1989). Rather, there should be evidence of "a congeries of acts." Id. (quoting Robinson v. Showa Kaiun K.K., 451 F.2d 688, 690 (5th Cir. 1971)).[7]

*B.*

To succeed on his unseaworthiness claim, Mr. Underwood must prove that the vessel was not reasonably fit for its intended use; it is the existence of an unseaworthy condition (such as an inadequate crew or unsafe work method) that would anchor liability. Where a plaintiff rests his unseaworthiness claim on the same theory offered to support his unsuccessful Jones Act claim, dismissal of the unseaworthiness claim typically is likewise warranted. Cf. Thomas v. Diamond M Drilling Co., 569 F.2d 926, 927-29 (5th Cir. 1978); see also Henderson v. T&M Boat Rentals, LLC, No. 17-2042, 2018 WL 3819930, at *6-7 (E.D. La. Aug. 9, 2018)(granting defendants' motion for summary judgment dismissing

---

[7] A seaman has a duty under both the Jones Act and general maritime law to act as an ordinary prudent seaman would act in the same or similar circumstances. Jackson v. OMI Corp., 245 F.3d 525, 528 (5th Cir. 2001). If a seaman's negligence contributes to his injury, his "contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." Jauch v. Nautical Services, Inc., 470 F.3d 207, 213 (5th Cir. 2006).

the plaintiff's Jones Act and unseaworthiness claims, finding that the plaintiff offered no evidence to support his conclusory assertion that the heavy cable being partially submerged in the water creates an unseaworthy condition); Gaylor v. Canal Barge Co., Inc., No. 14-2398, 2015 WL 5321756, at *3-4 (E.D. La. Sept. 10, 2015)(granting summary judgment dismissing the plaintiff's Jones Act and unseaworthiness claims related to one-man lifting method of 80-pound box, and observing that plaintiff's safety expert's opinion that it was unreasonable to leave it to the employee to determine the safest way to perform a task failed to raise a triable issue); Williams v. Int'l Const. Grp., LLC, No. 10-170, 2011 WL 1116312, at *3-5 (E.D. La. March 23, 2011)(Fallon, J.)(granting summary judgment dismissing Jones Act and unseaworthiness claims in a case in which the plaintiff was injured attempting to lift a heavy pad eye, finding that neither a full crew or any additional equipment was necessary for plaintiff to carry out the task, nor was the lack thereof the cause of his injuries); Johnson v. Lawson & Lawson Towing Co., Inc., No. 00-629, 2001 WL 812080, at *3 (E.D. La. July 17, 2001)(Vance, J.)(granting summary judgment dismissing Jones Act and unseaworthiness claims, rejecting the plaintiff's argument that the one-man method of installing 35-pound motor was an unseaworthy practice for lack of providing an additional crew member to perform

the installation more safely, and further observing that the plaintiff's safety expert "adds nothing to the equation").

For the same reasons summary relief is warranted in Parker Towing's favor on the Jones Act claim, summary relief dismissing the unseaworthiness claim is likewise warranted.  The plaintiff offers only his theory and unsubstantiated insinuation that more than one man was required to safely complete the pump-lifting task. There is no dispute that he had completed this task without assistance and that Captain Riley was available if he requested help.  Additionally, the plaintiff's focus on the broken extension hose is misplaced.  A vessel must be *reasonably* fit for its intended use.  There is no dispute that Mr. Underwood had available to him alternative methods for pumping out the water, including asking for help, swapping out the three-inch pump for a two-inch pump (the latter being more plentiful meant more plentiful extension hoses for the two-inch pumps as well), or requesting Captain Riley's assistance in either lifting, tying up, or removing the three-inch pump.  Mr. Underwood fails to identify an unseaworthy condition.

Finally, the more demanding causation standard further obstructs the plaintiff's ability to withstand summary judgment on the unseaworthiness claim.  Parker Towing submits that it is entitled to summary relief dismissing Mr. Underwood's unseaworthiness claim because he has produced no evidence that an

23

unseaworthy condition played a substantial part in causing his alleged back injury.  The Court agrees.

Parker Towing invokes Giroir v. Cenac Marine Servs., LLC, No. 18-3595, 2019 WL 1056862 (E.D. La. March 6, 2019) in which this Court granted a defendant's motion for summary judgment dismissing a plaintiff's unseaworthiness claim.  There, Giroir alleged he injured himself while retrieving a 60- to 70-pound oil pump stored on a shelf in the vessel's engine room.  Regardless of the pump's weight, the Court determined that the plaintiff failed to demonstrate that any condition of the vessel rendered it unseaworthy; the Court observed:

> Mr. Giroir's testimony that he injured his back while retrieving a sixty-seventy-pound  oil pump off of a shelf, without any facts tending to show that [the defendant] stored the pump in an unsafe location or instituted an unsafe procedure for lifting the pump, fails to establish a genuine dispute as to whether the [vessel] was unseaworthy.

Like Mr. Giroir, Mr. Underwood has produced no evidence that an unseaworthy condition played a substantial role in causing his alleged injuries.  He claims that the pump's height while on the bucket forced him to abandon safe lifting techniques and that he felt pain in his back when he lifted the pump from the bucket and twisted.  He also claims that the broken extension hose, lack of additional crew, or lack of a two-inch pump factored into his injury.  But even assuming that any of these factors genuinely

existed (that is, even assuming that it was not Mr. Underwood whom could have but failed to ask for help and whom could have but failed to ask for or swap out the three-inch pump with a two-inch pump), Mr. Underwood fails to show that these conditions played a substantial part in causing his alleged injury.  The plaintiff's expert's opinion that an extra crewmember may have prevented the injury does not raise a triable issue, considering the summary judgment record evidence that: (i) Captain Riley testified that he was available and he could have gotten Mr. Underwood a two-inch pump from another barge and that if he had been asked he would have assisted Mr. Underwood; and (ii) Mr. Underwood's own testimony that he knew he could ask for help if he needed it and that he felt he could (and indeed, he did) successfully maneuver the three-inch pump using Parker Towing-approved lifting techniques.  There is no evidence that the vessel was understaffed (to the contrary, Captain Riley was available to assist Mr. Underwood if asked to do so) or that this purported factor caused his injury.  Nor is there evidence supporting Mr. Underwood's theory that the broken extension hose and his election to use the bucket method workaround to overcome the absence of a workable extension hose played a substantial part in actually causing his injury.  The bucket method was not the only workaround, just the one he elected to use; doing so neither constitutes an unsafe work method *per se*, nor prevented

Mr. Underwood from asking for assistance if he felt that he was not able to use safe lifting techniques.

***

Although the causation standard for a Jones Act claim is featherweight, the negligence standard remains reasonable prudence under the circumstances; the mere occurrence of an injury does not establish liability and a practice is not necessarily unsafe or unreasonable merely because it injures someone.  And, a vessel owner is not required to furnish an accident-free ship; only one that is reasonably fit for its intended use.  There is simply no evidence to support the plaintiff's theory that Parker Towing was negligent or that the workplace was rendered unsafe due to an unworkable extension hose or the failure to articulate a lift-limit.

Accordingly, IT IS ORDERED: that the defendant's motion for summary judgment is GRANTED, and the plaintiff's claims are dismissed with prejudice.

New Orleans, Louisiana, July 20, 2021

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE